# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| **[UNDER SEAL]** | ) |
| *Plaintiffs,* | ) |
|  | ) |
| *vs.* | ) |
|  | ) |
| **[UNDER SEAL]** | ) |
|  | ) |
| *Defendants.* | ) |

**CIVIL ACTION NO.**

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**

**FIRST AMENDED COMPLAINT**

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

————————————————————x

**UNITED STATES OF AMERICA,**
*ex. rel* **DAVID FLORENCE** and **CHELSEA BASS**

*Dr. David Florence*
*70 Big Falls Circle*
*Manchester, Tennessee,*
*37355*

*Chelsea Bass, RN*
*902 Shady Lane*
*Manchester, Tennessee*
*37355*

**BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA; and THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, IOWA, INDIANA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT and WASHINGTON; and THE COMMONWEALTHS OF MASSACHUSETTS, VIRGINIA; and THE DISTRICT OF COLUMBIA**

*Plaintiffs,*

*vs.*

**ENVISION HEALTHCARE**
*1A Burton Hills Boulevard*
*Nashville, TN 37215*

**KKR & Co. Inc.**
*9 West 57th Street, Suite 4200*
*New York, NY 10019*

*Defendants.*

**CIVIL ACTION NO. 3:19-cv-00493**

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**FIRST AMENDED COMPLAINT**

FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *ET SEQ.*]; CALIFORNIA FALSE CLAIMS ACT [CAL. GOVT. CODE § 12650 *ET SEQ.*]; CAL. INSURANCE FRAUDS PREVENTION ACT [CAL. INS. CODE §1871.1]; COLORADO MEDICAID FALSE CLAIMS ACT [COLO. REV. STAT. § 25.5-4-303 *ET SEQ.*]; CONNECTICUT FALSE CLAIMS ACT FOR MEDICAL ASSISTANCE PROGRAMS [CONN. GEN. STAT. § 4-275 *ET SEQ.*]; DELAWARE FALSE CLAIMS AND FALSE REPORTING ACT [6 DEL. C. § 1201]; FLORIDA FALSE CLAIMS ACT [FLA. STAT. ANN. § 68.081 *ET SEQ.* MEDICAID CLAIMS ACT]; GEORGIA FALSE CODE ANN. § 49-4-168 *ET SEQ.*]; HAWAII FALSE CLAIMS ACT [HAW. REV. STAT. § 661-21 *ET SEQ.];* ILLINOIS FALSE CLAIMS ACT [740 ILL]; ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT [740 IL. COMP. STAT. 92/1(A)]; IOWA FALSE CLAIMS ACT [IA ST. CODE § 685.1 *ET SEQ.*]; INDIANA MEDICAID FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT [IND. CODE ANN. § 5-11-5.7-1 *ET SEQ.*]; LOUISIANA MEDICAL

1

)   ASSISTANCE PROGRAM, EX REL
)   [LA. REV. STAT. § 46:437.1 *ET SEQ.*];
)   MARYLAND FALSE HEALTH
)   CLAIMS ACT [MD CODE ANN. § 2-
)   601 *ET SEQ.*]; MASSACHUSETTS
)   FALSE CLAIMS LAW [MASS GEN
)   LAWS CH.12 § 5 *ET SEQ.*];
)   MICHIGAN MEDICAID FALSE
)   CLAIMS ACT [MICH. COMP. LAWS.
)   § 400.601 *ET SEQ.*]; MINNESOTA
)   FALSE CLAIMS ACT [MINN. STAT. §
)   15C.01 *ET SEQ.*]; MONTANA FALSE
)   CLAIMS ACT [MONT. CODE ANN. §
)   17-8-403 *ET SEQ.*]; NEVADA FALSE
)   CLAIMS ACT [NEV. REV. STAT.
)   ANN. § 357.010 *ET SEQ.*]; NEW
)   HAMPSHIRE FALSE CLAIMS ACT
)   [N.H. REV. STAT. ANN. § 167:61-B *ET*
)   *SEQ.*]; NEW JERSEY FALSE CLAIMS
)   ACT, N.J. STAT. § 2A:32C-1, *ET SEQ.*;
)   NEW MEXICO FRAUD AGAINST
)   TAXPAYERS ACT AND NEW
)   MEXICO MEDICAID FALSE CLAIMS
)   ACT [N.M. STAT ANN § 44-9-1 *ET*
)   *SEQ.* AND N.M. STAT ANN. § 27-2F-1
)   *ET SEQ.*]; NEW YORK FALSE
)   CLAIMS ACT [N.Y. STATE FIN. § 187
)   *ET SEQ.*]; NORTH CAROLINA FALSE
)   CLAIMS ACT [N.C.G.S. § 1-605 *ET*
)   *SEQ.*]; OKLAHOMA MEDICAID
)   FALSE CLAIMS ACT [OKLA. STAT.
)   TIT. 63 § 5053 *ET SEQ.*]; RHODE
)   ISLAND FALSE CLAIMS ACT [R.I.
)   GEN. LAWS. § 9-1.1-1 *ET SEQ.*];
)   TENNESSEE FALSE CLAIMS ACT
)   AND TENNESSEE MEDICAID FALSE
)   CLAIMS ACT [TENN. CODE ANN. §
)   4-18-101 *ET SEQ.* AND § 71-5-181 *ET*
)   *SEQ.*]; TEXAS MEDICAID FRAUD
)   PREVENTION LAW [TEX. HUM. RES.
)   CODE ANN. § 36.001 *ET SEQ.*];
)   VERMONT FALSE CLAIMS ACT [32
)   V.S.A. § 632]; VIRGINIA FRAUD
)   AGAINST TAXPAYERS ACT [VA.

)   CODE ANN. § 8.01-216.1 *ET SEQ.*];
                                  )   WASHINGTON STATE MEDICAID
                                  )   FRAUD FALSE CLAIMS ACT [RCW§
                                  )   74.66.005 *ET SEQ.*]; AND DISTRICT
                                  )   OF COLUMBIA FALSE CLAIMS ACT
                                  )   [D.C. CODE ANN. § 2-308.14 *ET SEQ.*]
                                  )
                                  )
                                  )   **FILED UNDER SEAL**
                                  )   **PURSUANT TO**
                                  )   **31 U.S.C. § 3730(b)(2)**
                                  )   JURY TRIAL DEMANDED
————————————————————————x

## COMPLAINT

Relators David Florence and Chelsea Bass, acting on their own and on behalf of the United States of America; The States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Iowa, Indiana, Louisiana, Maryland, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont and Washington; The Commonwealths of Massachusetts, Virginia; and The District of Columbia, bring this *qui tam* action under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* (2012), against Defendants Envision Healthcare ("Envision"), and KKR & Co. Inc. ("KKR") to recover all damages, penalties, and other remedies provided by the FCA for the United States and Relator.

## INTRODUCTION

1.      This is an action on behalf of the United States for treble damages and civil penalties arising from Defendants' conduct in violation of the FCA.

2.      As set forth in this complaint, Envision, through its subsidiaries, has intentionally "up-coded" emergency department visits to receive higher payments from medical payers, including Medicare, Medicaid, and other Government-funded health care programs. Envision's fraudulent scheme has ensured that even minor injuries or illness, like a fall with "no obvious injuries" or a "mild" chest pain that had been occurring for months, would result in one of the two highest Emergency Department physician codes, HCPCS Code 99284 and 99285. Medicare regulations and guidelines reserved these codes for high risk diagnoses and complex medical decisions, like deciding to perform emergency open surgery or deciding not to resuscitate a patient. In 2019, the Medicare physician fee pricing schedule set the reimbursement for HCPCS Code 99285 as $176.23 and HCPCS Code 99284 as $119.65.

Envision has both provided physicians and billing services for emergency departments, such as Unity Medical Center ("Unity")[1] – the hospital where Relators work. As soon as Envision had contracted with a hospital, the percentage of patients that were coded with HCPCS Code 99284 or 99285 immediately skyrocketed.[2] Unity contracted with Envision to provide both physicians and billing services for the hospital's emergency department. On September 1, 2016 Envision physicians began working in Unity's emergency department. Envision submitted HCPCS codes for all patients in Unity's emergency department to medical payers, including Medicare and Medicaid, for repayment.

In 1995 and 1997, Centers for Medicare & Medicaid Services (CMS) provided Evaluation and Management ("E/M") guidelines for what coding level should be submitted to the Government for a patient's visit to the emergency department. Codes are dependent on patient charts. These guidelines require both that the patient chart be adequately detailed and the patient's diagnosis be sufficiently severe. For example, to be coded as HCPCS 99285 the patient's chart must include (i) a comprehensive history, (ii) a comprehensive exam, and (iii) demonstrate a high complexity medical decision. The guidelines provide requirements for what constitutes "comprehensive" for each category and what is a high complexity medical decision. For example, a high complexity medical decision includes making diagnoses of a cerebral hemorrhage or a stroke. Similar criteria and clinical examples are likewise provided for emergency services E/M HCPCS Codes 99281, 99282, 99283 and 99284.

---

[1] On July 1, 2015, Unity was formed after Medical Center of Manchester and United Regional Medical Center merged. Since then, Unity has gone by a variety names, including "United Regional Investment Group" and "Coffee Medical Group." In this Complaint, Unity refers to the hospital formed by the merger of Medical Center of Manchester and United Regional Medical Center.

[2] Julie Creswell, et. al., *The Company Behind Many Surprise Emergency Room Bills*, THE NEW YORK TIMES (July 24, 2017), https://www.nytimes.com/2017/07/24/upshot/the-company-behind-many-surprise-emergency-room-bills.html.

To meet the required guidelines, Envision required each Envision doctor and each hospital doctor to ensure that patient charts had sufficient detail to fulfill the comprehensive history and comprehensive exam requirements. For example, a doctor needed to review and chart ten of the[5] patient's body systems (i.e., cardiovascular, respirator, gastrointestinal, etc.) to satisfy one factor within the comprehensive history requirement. Frequently, Envision had physicians chart "[a]ll (other) systems have been reviewed and are negative." This one-line satisfied the review of systems requirement and was included regardless whether the patient's systems were reviewed. The doctor would also chart to meet all the other factors for a comprehensive history and a comprehensive exam.

If a doctor failed to include the necessary chart elements to support an HCPCS 99285 code[6], the Envision coder would call or email the doctor requesting the doctor to add additional notes to the chart. Envision would sometimes attach the chart with comments noting where the physician needed to make the change. The Envision coder would continually harass the doctor to make the change until it was completed and to condition the doctor to fill out future patient charts in accordance with Envision's fraudulent scheme.

To support the inference that the doctor made a high complexity medical decision, Envision used the nurse acuity score to generate the equivalent emergency department level ("ED level") notation on the chart. The ED level would support the equivalent HCPCS code. For example, a nurse acuity level 5 would equal an ED level 5, which would be billed as an HCPCS code 99285. This method is fraudulent as (i) the Nurse Acuity Level is used for nurse staffing decisions and has no relation to the medical decision complexity or the patient's level of risk, and (ii) the physician codes are scaled through five levels (HCPCS 99281-99285) and the nurse acuity levels are scaled at levels 1 through 8. In other words, a score created for *nurse staffing* information

6

is used as conclusive proof for the *physician's* diagnosis of the severity level of the injury or sickness. Further, an average nurse acuity score is used to support the highest HCPCS code.

8. The patients' charts demonstrated that their diagnoses are not severe, if there were diagnoses charted at all. Patients often waited over two hours after they are triaged to see a physician because their conditions were not severe, were discharged without a new diagnosis, and many patients' charts stated "[p]atient's condition was non-emergent." These patients did not have an "immediate significant threat to life or physiologic function" that is generally necessary to be billed at HCPCS Code 99285.[3]

9. Further, physicians and nurses would order tests to give the appearance of a more complex medical decision to support the higher code. These tests were unnecessary and unreasonable, and the results of the tests would often be negative. Therefore, Envision also caused bills for tests to be submitted by doctors, like radiologists, to Medicare, Medicaid, and other government-funded health care programs for payment.

10. Relators believe that this scheme is not only perpetrated at Unity, but in each hospital with whom Envision or its subsidiary contracts across the United States. Through this scheme, Envision has fraudulently submitted and caused to be submitted numerous false claims for payments to the Federal Government in violation of the FCA. If the Government was aware of this fraudulent scheme, they would not pay the claim. *See, e.g. U.S. ex rel. Trombetta v. EMSCO Billing Servs., Inc.*, No. 96 C 226, 2002 WL 34543515, at *2 (N.D. Ill. Dec. 5, 2002).

## PARTIES

---

[3] Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule and Other Revisions to Part B for CY 2017; Medicare Advantage Bid Pricing Data Release; Medicare Advantage and Part D Medical Loss Ratio Data Release; Medicare Advantage Provider Network Requirements; Expansion of Medicare Diabetes Prevention Program Model; Medicare Shared Savings Program Requirements, 81 Fed. Reg. 80170, 80196 (Nov. 15, 2016) ("2016 Rule").

**Relator Dr. David Florence** was born and raised in Galt, Ontario, Canada and is a Canadian citizen and permanent resident of the United States. He relocated to the United States for his Bachelor of Science degree at Sterling College in Sterling, Kansas and has practiced medicine[11] in the United States ever since. In 1976, he received his Associate's Degree in Nuclear Medicine Technology at Wesley Medical Center in Wichita, Kansas. In 1981, Relator Florence received his medical degree at the Osteopathic Physician and Surgeon University of Health Sciences College of Osteopathic Medicine in Kansas City, Missouri. He is currently a resident of the State of Tennessee.

From September 1983 to April 2018, Relator Florence contracted with many hospitals[12] as a physician in the Manchester, Tennessee area. Relator Florence is the former Chief of Staff of Medical Center of Manchester and United Regional Medical Center. He has worked in the emergency department at Unity in Manchester, Tennessee since it was formed. Relator Florence then became a part-owner of Unity in 2007. Notably, Relator Florence won the Tennessee Osteopathic Medical Association's ("TOMA") "Physician of the Year" award for 2018-2019, the highest honor a physician can receive in the state of Tennessee. He is also an executive board[13] member of TOMA.

As part-owner with 38 years of experience as a physician in the emergency department, Relator Florence is intimately familiar with the processes within the emergency department, what is important to chart, and the diagnoses. He has worked in the emergency department[14] at Unity before and after it contracted with Envision to provide physicians and coding services.

Relator Florence has first-hand knowledge of how Envision affected the processes and charts of Unity. The allegations in this Complaint are grounded in information Relator

Florence discovered during the course of his work with Unity and Envision in his capacity of physician in the ED.

**Relator Chelsea Bass, RN** is a citizen of the United States and a resident of the State of Tennessee. Relator Bass has a Bachelor of Science in Nursing from the University of Tennessee in Knoxville and has over 12 years of experience as a Registered Nurse ("RN"). She [15.] is the Owner of a consulting company called Venture Consulting, LLC located in Manchester, TN. Through her company, Relator Bass has worked for healthcare practitioners, physicians, clinics, and attorneys. From September 2011 to September 2016, Relator Bass was credentialed with staff privileges to work as a Registered Nurse, Physician's Assistant, and Liaison at Unity Medical Center. She has worked as a Registered Nurse, Medical Coder and Reviewer, Medical Manager, Compliance Officer, Auditor, Medical Consultant as well as a Legal Nurse Consultant since 2011. She also has experience with working in emergency rooms throughout her career and spent two years working as a Staff and Charge Nurse for an Intensive Care Unit at Sisters of Mercy Health Systems from June 2009 to July 2011. From January 2012 to April 2015, Relator Bass was the head RN and Compliance Officer at a local clinic. In addition to these experiences, degrees, and certifications, Relator Bass has completed coursework for and obtained a Career Diploma as a Medical Biller and Coder which is pending certification by the American Association of Professional Coders (AAPC) as a Certified Professional Coder (CPC). Relator Bass investigated correspondence between Envision and Relator Florence, audited charts obtained by Relator [16.] Florence, and confirmed with him that Envision is overbilling clients, Medicare, Medicaid, and other government-funded health care programs.

**KKR & Co. Inc.** recently acquired **Envision Healthcare,** the parent company of Envision, in June 2018 and took the company private. KKR is a global investment firm

headquartered in New York, New York and incorporated in Wilmington, Delaware. Henry Kravis and George R. Roberts are Co-Chairman/Co-CEO of KKR.

**Envision Healthcare ("Envision"),** headquartered in Nashville, Tennessee and incorporated in Wilmington, Delaware, is an American provider of physician practice management services for emergency departments and other health services. Envision's CEO is Christopher A. Holden.

17.

Envision generally forms subsidiaries to contract with hospitals. For example, Bledsoe Falls Emergency Physicians LLC, a subsidiary of Envision, began working with Unity on September 1, 2016. Through these contracts, Envision provides and schedules emergency room ("ER") physicians to the hospital emergency department and handles the Professional coding and billing processes to medical payors. At Unity, all the ER physicians are provided and paid by Envision, but all other staff, like nurses and administrators, are employed and paid by Unity.

18.

19. Envision and Envision subsidiaries code and generate the bills for the physicians' ER services and submit these bills to the patient's medical payors, including Medicare, Medicaid, and other government-funded health care programs. The payor pays the Envision subsidiary directly.

20.

Each Envision subsidiary's billing designee reports to Envision Physician Service's Chief Compliance Officer to ensure uniform policies and practices. GENERAL CODING AND BILLING FOR EMERGENCY SERVICES, ENVISION PHYSICIAN SERVICES (May 2018), https://www.emcare.com/about/compliance/evps-policies/301-coding-billing-for-emergency-services.pdf. The coders are required to follow strictly the appropriate codes based on the "Centers for Medicare and Medicaid Services (coding manual) formerly the 1995 Healthcare Financing Administration Evaluation and Management Codes Documentation Guidelines." *Id.*

10

## JURISDICTION AND VENUE

This Court has jurisdiction over the subject-matter of this action under 28 U.S.C. § 1331, as this civil action arises under federal law, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under the FCA.

21.

This Court has personal jurisdiction over both Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, as both Defendants have minimum contacts with this jurisdiction and both Defendants can be found in, and transact business within, this judicial district.

22.

Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because one or more Defendants reside in this district and one or more Defendants transact business in this district.

23.

24.     The facts and circumstances which give rise to Defendants' violation of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

25.

Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

26.                    ## LEGAL BACKGROUND

### A.     False Claims Act

The FCA, 31 U.S.C. §§ 3729 *et seq.*, was originally enacted in 1863 during the Civil War and was substantially amended by the False Claims Amendments Act of 1986, as signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a

private cause of action for the protection of employees who act in furtherance of the purposes of the FCA. Congress acted upon finding that (a) fraud in federal programs and procurement is pervasive and that (b) the FCA—which Congress characterized as the primary tool for combating fraud in Government contracting—was in need of modernization.

The FCA is the Government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. See S. Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) reprinted in 1986 U.S.C.C.A.N 5266.

The FCA provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $22,927 for each such claim, plus three times the amount of the damages sustained by the Government, including attorneys' fees. See 31 U.S.C. § 3729(a)(1); 28 CFR § 85.5.

29. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action on behalf of the Government. A person who brings a qui tam suit under the FCA as a relator on behalf of the Government is entitled to share in any recovery.

A qui tam complaint is to be filed under seal for sixty days (without service on the Defendants during such sixty-day period). This enables the Government (a) to conduct its own investigation without Defendants' knowledge or awareness, and (b) to determine whether to join the action.

The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA"), passed by Congress and signed into law on May 20, 2009, for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the False Claims Act. Pub. L. No. 111-21, 123 Stat. 1617 (2009).

In its current form, the FCA subjects to liability any person who (a) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (b) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false[32] or fraudulent claim"; or (c) "conspires to commit" a violation of these two provisions. 31 U.S.C. § 3729(a)(1).

To establish that a defendant acted "knowingly" under the FCA, no "proof of specific intent to defraud" is required; it is sufficient when a defendant knows that information[33] provided is false, acts in deliberate ignorance of its truth or falsity, or acts in reckless disregard of its truth or falsity. 31 U.S.C. § 3729(b)(1).

For purposes of the FCA, a "claim" is any request for money submitted to the[34] contract, which covers both false claims made while entering into a contract with the federal Government as well as claims for payment under an existing contract. 31 U.S.C. § 3729(b)(2).

## B.    Medicare – Generally

[35] Medicare, enacted in 1965 under Title XVIII of the Social Security Act, is a third-party reimbursement program that underwrites medical expenses of the elderly, the disabled, and people with qualifying health conditions specified by Congress. 42 U.S.C. §§ 1395 *et seq.*. Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund. Medicare Part A covers inpatient hospital services and related care. Medicare Part B generally covers physician services, including medical and surgical treatment and outpatient treatment and diagnosis. Part B, 42 U.S.C. §§ 1395j *et seq.*; 1395l (payment of benefits). Physicians, non-physician practitioners, and other health care suppliers must enroll in the Medicare program to be eligible to receive Medicare payment for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505.

Most hospitals, including Unity Medical Center, derive a substantial portion of their revenue from the Medicare Program.

Medicare is administered by the Centers for Medicare & Medicaid Services (CMS). At all times relevant to this complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and "Medicare Administrative Contractors," to act as agents in reviewing and paying claims submitted by healthcare providers. Payments are made with federal funds. *See* 42 U.S.C. § 1395h; 42 C.F.R. §§421.3, 421.100.

In order to enter into a Provider Agreement authorizing them to provide services to Medicare beneficiaries, all providers must submit an enrollment application to the program on its Form CMS 855A. Among other things, the application requires providers to sign a certification that states in relevant part:

Section 15: CERTIFICATION STATEMENT

A. Additional Requirements for Medicare Enrollment …

3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
…
5. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Medicare Enrollment Application, Institutional Providers, CMS – 855A.

Form CMS 855A must be resubmitted every five years to verify the accuracy of enrollment information or any time there is a change in the information provided on the form. 42 CFR §424.515.

All providers that submit Medicare claims electronically to CMS must certify in their application that, among other things, they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." *See* DHHS & CMS, Pub 100-04, MEDICARE CLAIMS PROCESSING, ch. 24, § 30.2.A (2019).

41.

All providers must also contemporaneously create and maintain accurate medical records that support the providers' claims for reimbursement. *See, e.g.*, CMS, MLN MATTERS NUMBER: SE1022 (2012), https://www.cms.gov/outreach-and-education/medicare-learning-network-mln/mlnmattersarticles/downloads/se1022.pdf ("Providers/suppliers should maintain a medical record for each Medicare beneficiary that is their patient. Remember that medical records must be accurately written, promptly completed, accessible, properly filed and retained.")

42.

Falsification of records, upcoding, and billing for services not rendered violate Medicare standards requiring that submitted claims accurately reflect the services actually rendered. *See, e.g.*, HHS OFFICE OF INSPECTOR GENERAL, ROADMAP FOR NEW PHYSICIANS, AVOIDING MEDICARE AND MEDICAID FRAUD AND ABUSE, at 9-12 http://oig.hhs.gov/fraud/PhysicianEducation/ (Explaining the general requirement for billing accurately, and specifically warning against upcoding, billing for services not rendered, and billing more than once for the same service. And, further explaining the requirement to maintain accurate and complete medical records and documentation of the services provided to ensure submitted claims are supported by true and accurate records.)

15

### i. Medicare – Part B

Medicare Part B establishes a voluntary supplemental insurance program that pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services, and hospital outpatient services. See 42 U.S.C. §§ 1395k, 1395m, 1395x.[43]

For HCPCS Codes 99281 to 99285, providers receive reimbursement under Medicare Part B. *See e.g.*, CPT CODE 99285 Fact Sheet, CGS ADMINISTRATORS, LLC (Feb. 12, 2019), https://www.cgsmedicare.com/partb/mr/pdf/99285.pdf.[44]  CMS established reimbursement levels corresponding to each of the HCPCS Codes.  Health care providers submit claims for treatment given to Medicare patients to their local Intermediary.  After verifying that the patient is covered by Medicare, the Intermediary then pays the claim according to Medicare's reimbursement schedule.  In 2019, the CMS reimbursed the following amounts for the following HCPCS Codes:[4]

| HCPCS CODE | MEDICARE REIMBURSEMENT[5] |
|:---:|:---:|
| 99281 | $21.62 |
| 99282 | $42.17 |
| 99283 | $63.07 |
| 99284 | $119.65 |
| 99285 | $176.23 |

### ii. Medical Necessity

---

[4] This amount differs from the amount the provider charges to insurers.  For example, Envision charges insurance companies $2,257.00 for HCPCS Code 99285, $1,515.00 for Code 99284, and $1,017.00 for Code 99283.

[5] The values in the table is the pricing information for HCPCS Codes 99281–99285 at the National Payment Amount.  The fee Medicare will pay for each claim can be different than outlines, as the fee schedule is determined by a formula set forth in 42 U.S.C. § 1395w-4. The formula consists of three core components – the relative value for services, the conversion factor, and the geographic adjustment factor – that are calculated together in a multi-step process.

In addition to compliance with other national or local coverage criteria, 42 U.S.C. § 1395ff(f)(1)(B), (2)(B), Medicare requires, as a condition of coverage, that services be reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A).

45.     Federal law provides that it is the obligation of the provider of health care services to ensure that services provided to Medicare beneficiaries are "provided economically and only when, and to the extent, medically necessary" and are "supported by evidence of medical necessity." 42 U.S.C. § 1320c-5(a)(1), (3).

Providers must ensure that services provided are not substantially in excess of the needs of such patients. 42 U.S.C § 1320a-7(b)(6).

### iii.     Medicare Part C – Medicare Advantage

48.     Medicare Part C, also known as Medicare Advantage, authorizes qualified individuals to opt out of fee-for-service coverage under Medicare Parts A and B and instead enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services. 42 U.S.C. §§ 1395w-21, 1395w-28. The private health insurance companies, also known as Medicare Advantage Organizations ("MAO") are authorized to administer Medicare benefits on behalf of the United States.

The MAOs contract with providers to provide health care services for the enrollees of the MAO. "All contracts or written agreements must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions." 42 C.F.R. § 422.504(i)(4)(iv)(c).

MAOs are funded by beneficiaries who usually pay monthly premiums and copayments and also by CMS through monthly capitated payments (a yearly rate paid out in monthly installments).

17

The amount of the capitation payments made by CMS to MAOs is adjusted based on the health status of each beneficiary. 42 U.S.C. § 1853(a)(1)(C), (a)(3). In 2004, CMS implemented the Hierarchical Condition Category (HCC) model to calculate these risk adjustment payments.

51.

MAOs collect risk adjustment data over the calendar year from hospital inpatient facilities, hospital outpatient facilities, physicians and through other sources, and send them to CMS. "CMS categorizes the diagnoses into groups of clinically related diseases called HCCs and uses the HCCs, as well as demographic characteristics, to calculate a risk score for each beneficiary." OFFICE OF INSPECTOR GENERAL, RISK ADJUSTMENT DATA VALIDATION OF PAYMENTS MADE TO EXCELLUS HEALTH PLAN, INC., FOR CALENDAR YEAR 2007 (CONTRACT NUMBER H3351), DEP'T OF HEALTH AND HUMAN SERVICES, at p. i, https://oig.hhs.gov/oas/reports/region2/20901014.pdf. CMS uses the risk score to calculate the capitated payments to the MAOs for the following calendar year (i.e., data collected in 2016 is used to calculate payments for 2017).

52.

53.

Emergency billing codes are one of the factors CMS considers when calculating the risk score for the patients. *See, e.g., Details for title: Medicare Risk Adjustment Eligible CPT/HCPCS Codes*, CMS (last visited Apr. 18, 2019), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Risk-Adjustors-Items/CPT-HCPCS.html. Therefore, a person that receives a fraudulently higher emergency department billing code would be considered a higher risk patient. This justifies a higher capitation payment from CMS to the MAO.

Emergency billing codes are reimbursed by MAOs as part of their Medicare coverage. *See, e.g.,* E. Trish, et al., "Physician Reimbursement in Medicare Advantage Compared With Traditional Medicare and Commercial Health Insurance," 177(9) JAMA Intern Med 1287

(Sept. 1, 2017), https://www.ncbi.nlm.nih.gov/pubmed/28692718. Therefore, money from CMS is used to pay HCPCS codes 99281 to 99285.

## C.    Medicaid Program

Medicaid is a federal and state funded health program, benefiting "categorically eligible" people, who are mostly low-income individuals and families. Like Medicare, it was created in 1965 pursuant to Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq..* Under Medicaid, participating states administer state Medicaid programs that subsidize healthcare coverage for eligible residents. The individual state programs reimburse medical providers and hospitals for services rendered to program participants. The states receive federal funds to pay for Medicaid services.

56.

Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396a(a)(10)(A), 42 U.S.C. § 1396d(a)(1)–(2), and uses a cost reporting method similar to that used under Medicare.

57.

The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. *See* 42 U.S.C. §1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42 U.S.C. §1396b(a)(1). The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . . " *See* 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation. 42 C.F.R. § 400.203.

58.

Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state. Although there are variations in the agreements among

19

the states, all states require the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, including the fraud and abuse provisions.

Similar to Medicare coverage requirements, medical services must be reasonable and medically necessary in order to be subsidized by Medicaid. Claims for reimbursement presented by a provider to a state Medicaid program are subject to terms of certification. These [59.] terms require that the medical services for which the claims are sought were provided in accordance with applicable federal and state laws. This is a standard fee-for-service model in which Medicaid acts in accordance with Medicare Part B.

In Tennessee, the Medicaid program is run by TennCare, operates more like Medicaid [60.] Part C. TennCare operates an integrated, full-risk, managed care program, and the services are offered through managed care entities, or Managed Care Organizations (MCO's). Some of the MCOs in Tennessee are AmeriGroup, BlueCare, and UnitedHealthcare.

[61.] In a managed care program, TennCare pays the MCOs a Per Member Per Month (PMPM) rate depending on the patient's health risk. The MCOs use the proceeds from Tennessee's [62.] PMPM payment to pay the providers for services delivered to TennCare members.

Emergency services are covered by TennCare. *See* Tenn. Comp. R. & Regs. 1200-13-13-.04 (2). Therefore, the MCOs must use funds from TennCare to reimburse HCPCS Codes [63.] 99281 to 99285.

TennCare provides health care for approximately 1.3 million Tennesseans and operates with a budget of approximately $12 billion.[6]

**D.    Other Government-Funded Health Programs**

---

[6] "TennCare Overview," Division of TennCare, https://www.tn.gov/tenncare/information-statistics/tenncare-overview.html (last visited Apr. 17, 2019).

20

In addition to Medicare and Medicaid, the federal government reimburses a portion of the cost of medical services under several other federal health care programs with similar coverage requirements, including, without limitation, programs administered by the Department of [64] Defense (the "DOD"), the Department of Veteran's Affairs (the "VA"), and the Office of Personnel Management (the "OPM").

The DOD administers TRICARE (formerly CHAMPUS), a health care program covering individuals and dependents affiliated with the armed forces. The VA administers its own [65.] health program, along with CHAMPVA (a shared cost program), covering families of veterans. OPM administers the Federal Employee Health Benefit Program, a health insurance program covering federal employees, retirees, and survivors.

**E.     Evaluation and Management Services**

[66.]     Most physicians and other billing practitioners bill patient visits under a relatively "generic set of codes that distinguish level of complexity, site of care, and in some cases, between new or established patients." Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule and Other Revisions to Part B for CY 2018; Medicare Shared Savings Program Requirements; and Medicare Diabetes Prevention Program, 82 Fed. Reg. 52976, 53163 (Nov. 15, 2017) ("2017 Rule"). These codes are the Evaluation and Management ("E/M") visit codes. There are three level E/M visit codes for hospital and nursing facility inpatients and five levels for hospital outpatient E/M visit codes. The different code level for the billing depends on the [67.] complexity. Hospital outpatient E/M visit codes also distinguish whether or not the patient is new to the billing practitioner.

Visits to the emergency department are considered outpatient E/M visit codes.

CMS requires that Billing practitioners maintain information in the medical record, commonly found in patient charts, to document that they have reported the correct level E/M visit code. The billing practitioners follow CMS guidelines that specify the kind of information needed to support Medicare payment for each level. CMS guidelines describe three key components to selecting the appropriate level: [68]

    a. History of Present Illness ("History");

    b. Physical Examination ("PE"); and

    c. Medical Decision Making ("MDM").

While there are three components to select the appropriate level, CMS believes that "differences in MDM are likely the most important factors in distinctions between visits of different levels." 2017 Rule, at 53164. [69]

[70] There are two versions of the documentation guidelines, commonly referenced based on the year of their release (the "1995 Guidelines" and "1997 Guidelines"). Physicians and billing practitioners may bill Medicare under either the 1995 or 1997 guideline, but not a combination of the two. After September 10, 2013, billing practitioners can use the 1997 documentation guidelines for an extended history of present illness along with other elements from the 1995 guidelines.[7] [71]

A general overview of the requirements on the level of documentation that is required to meet that level of service is below:

**History of Present Illness**

| Type of History | Chief Complaint | History of Present Illness ("HPI") | Review of Systems ("ROS") | Past Family and Social History ("PFSH") |
| --- | --- | --- | --- | --- |
| | | | | |

---

[7] The differences between the 1995 and 1997 guidelines are generally minor and will be explained when necessary in the Complaint.

| | | | | |
|---|---|---|---|---|
| Problem Focused | Required | Brief | N/A | N/A |
| Expanded Problem Focused | Required | Brief | Problem Pertinent | N/A |
| Detailed | Required | Extended[8] | Extended (two to nine systems) | Pertinent |
| Comprehensive | Required | Extended | Complete (ten or more systems) | Complete (two or three of patient's past history, social history and family history) |

**Physical Examination**

| Type of Examination | Description |
|---|---|
| Problem Focused | Up to Five elements of one or more organ system(s) or body area(s) |
| Expanded Problem Focused | At least six elements of one or more organ system(s) or body area(s) |
| Detailed | At least six organ systems or body areas with at least two elements identified. Or twelve elements in an organ system or body area. |
| Comprehensive | At least nine (eight or more in 1995 Guidelines) organ systems or body areas, with two elements identified or all elements identified in a single organ system or body area. |

**Medical Decision Making (two of the three elements must be met or exceeded to support the level of medical decision making).**

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data to be reviewed | Risk of Significant Complications Morbidity, and/or Mortality |
|---|---|---|---|
| Straightforward | Minimal | Minimal or None | Minimal |
| Low Complexity | Limited | Limited | Low |
| Moderate Complexity | Multiple | Moderate | Moderate |
| High Complexity | Extensive | Extensive | High |

---

[8] To be an extended HPI, the 1995 guidelines allow for the doctor to document four or more elements of the present HPI, and the 1997 guidelines allow for the four or more elements of the present HPI or the status of at least three chronic or inactive conditions.

CMS has developed requirements to determine the level of documentation and the complexity of decision-making process for the emergency room services. There are five HCPCS Codes, HCPCS Code 99281–99285, used for emergency department physician evaluation and management ("E/M") services. HCPCS Code 99281 is used for the lowest level of emergency room services and 99285 is used for the highest level of services.

72.

For HCPCS code 99281, the billing practitioner must show: a problem focused history; a problem focused examination; and straightforward medical decision making. The remaining components that are required for each HCPCS Code are shown in the table below:

73.

| HCPCS Code | History | Exam | MDM |
|---|---|---|---|
| 99282 | Expanded Problem Focused History | Expanded Problem Focused Examination | Low Complexity |
| 99283 | Expanded Problem Focused History | Expanded Problem Focused Examination | Moderate Complexity |
| 99284 | Detailed History | Detailed Exam | Moderate Complexity |
| 99285 | Comprehensive History | Comprehensive Exam | High Complexity |

74.

Since late 1994, CMS has notified all providers, including Envision, that the Guidelines would be used by CMS for audit and review purposes. Envision has also made following the Guidelines part of their coding policy. GENERAL CODING AND BILLING FOR EMERGENCY SERVICES, ENVISION PHYSICIAN SERVICES (May 2018), https://www.emcare.com/about/compliance/evps-policies/301-coding-billing-for-emergency-services.pdf. The coders are required to follow strictly the appropriate codes based on the "Centers for Medicare and Medicaid Services (coding manual) formerly the 1995 Healthcare Financing Administration Evaluation and Management Codes Documentation Guidelines."

75.

An E/M audit form should be completed by the coders to determine the patient's E/M level. This form also requires the auditor to confirm that the patient met the requisite HPI,

24

Exam, and MDM. For each system, examples of the examination and the table outlining the patient risk is clearly laid out for the auditor. *See* Ex. A. The coder/biller submits the code to the Government for payment either electronically through secure software to MAC or by using CMS Form-1500.

There is a separate step after the ED code is generated by the coder for the internal auditor to ensure that the E/D code utilized was correct. If the auditor finds that any false claim has[76] been made, there are company processes to report the correct code(s) to CMS and also inform them of any overpayments as well as a procedure to repay an overpayment. The processes are generally established by the company's Compliance Officers.

Auditors on behalf of the government can also use this form to ensure the coding [77.] and billing was done correctly.

## FACTUAL ALLEGATIONS

A.     **Envision's Fraudulent Scheme Ensures Patients' HCPCS Codes Are Unjustifiably Up-Coded.**

[78.]

Envision masterminded and engaged in a fraudulent scheme to up-code emergency department visits to the highest level, reserved for health problems that are an "immediate significant threat to life or physiologic function," even where the patient complained of and had [79.] symptoms as mild as a common cold.

They perpetrated this scheme in two general ways. First, Envision ensured that documentation on ER patients' charts supported the final code that determined the amount billed to the patient. Thus, the History and the PE were documented as comprehensive, even in non-emergent situations when the tests purportedly performed on the patient's charts were unnecessary. Physicians charted reviews that were not performed and ordered tests that were unnecessary to diagnose or treat the patient's non-emergent symptoms to meet the comprehensive criteria. Each

medical examination ordered by the physician also contributes to a higher nurse acuity score, which Envision also used to up-code.

In the event a patient's medical chart does not warrant "comprehensive" codes, Envision's coders will return the chart to ER doctors or call the ER doctors to revise them such that the chart will reflect services appropriate for a comprehensive code. After repeated phone calls and instruction from Envision to physicians to make the patient's charts more comprehensive, the physicians have been trained to chart aggressively. These lessons have been passed on to the nurses.[80]

According to Medicare regulations and guidelines, the patient's needs cause the documentation to support an ED level 5 code. Envision purposefully ignores the patient's needs, instead unilaterally charting to support an ED level 5 code.[81]

82. Second, Envision supported the MDM high complexity decision with the number listed on the nurses' 8-level acuity system. This practice is fraudulent for two reasons. First, there is a mismatch in ranges. Envision has failed to distinguish between the nurses' 8-level acuity system and the ER doctors' 5-level acuity system. Specifically, the physician ED Code is based on the nurses' acuity 8-level system. This physician 5-level system corresponded to the applicable HCPCS codes (i.e., an ED Level 1 is coded as a HCPCS code 99281). *See, e.g.*, Ex. B. For example, if a patient received a nurse acuity score of 5 out of 8, the chart would contain an ED level 5, which corresponds with an HCPCS Code 99285. A number in the middle of the range for the nurse acuity system becomes the highest number on the physician ED level and HCPCS Code ranges, thereby misidentifying the severity of the patient.[83]

Second, the nurse acuity score is unrelated to medical diagnosis, physicians' services, or the patient's health. The nurse's acuity code is for staffing decisions to help identify

which patients required more nursing activity. It is a facility code, not an HCPCS Code. The score increases based on the amount of nurse activity. For example, points are given each time the nurse was "checking vitals" or made "brief reassessment" of the patient. There is the same amount of points added to the nurse acuity score for a nurse checking on a patient with a broken foot or a patient who suffered a heart attack.

84. The nurse is responsible for inputting their activities performed into the veEDIS system.[9] Each activity is quantified as a point value in the veEDIS system. For example, the activity of checking vital signs is worth one point while inserting an IV is worth 15 points. *See, e.g.*, Ex. C at 8. The veEDIS system adds all point values of all the nurse activities to compute the total number of acuity points. The total number of acuity points corresponds with a nurse acuity level, as shown on the table below.

| Level | Point Range |
|---------|-------------|
| Level 1 | 0 – 10 |
| Level 2 | 11 – 20 |
| Level 3 | 21 – 50 |
| Level 4 | 51 – 80 |
| Level 5 | 81 – 224 |
| Level 6 | 225 – 324 |
| Level 7 | 325 – 424 |
| Level 8 | 425 – |

85. Therefore, the more involved the nurse is with the patient, the more veEDIS points the nurse will accrue, and the patient will have a higher nurse acuity level.

Conversely, the doctors' acuity scale, is contingent on the severity and risk of injury. For example, an ED level 5 should be reserved for situations that pose an immediate

---

[9] veEDIS is not deployed at all hospitals. Other hospitals instead use similar systems to veEDIS, like EPIC and MEDITECH, to chart nurse activity. Upon information and belief, Envision exploits the software used at hospitals that deploy a similar software system to veEDIS to further their fraudulent scheme.

significant threat to life or physiologic function for the patient. It is based on the physician's medical decision making.

Plaintiffs/Relators recovered numerous charts in which the nurses' acuity level is transferred to be the physician's ED level. Many of these charts clearly demonstrate the patient's total number of acuity points falling within the nurses' acuity range for a level 5 and being applied as the doctor's ED level 5. This ED level is used to bill the patients at an HCPCS Code of 99285, and as mentioned, Envision's scheme has ensured that the chart "supports" that coding level.

86.

By forcing physicians to chart to receive a comprehensive score for the HPI and the PE, whether deservedly or not, and by transferring unrelated and inflated nurse acuity scores as a basis for the HCPCS Codes, Envision is purposefully up-coding the HCPCS codes causing the Government to pay claims that are false.

87.

88.        Many of the patients' symptoms and diagnoses do not warrant an ED level 5 or even ED level 4 codes because they are not severe enough to justify coding at these levels. A sampling of patient charts demonstrates that ED Level 5 codes were used for patients that had minor injuries or sicknesses and were low risk from the moment they entered the Emergency Department. *See, e.g.*, Ex. C, E-P. Every chart in this sample was incorrectly coded.[10] Upon information and belief, Envision perpetrates this scheme to generate up-coded HCPCS codes for patients across the country in every hospital with which it or its subsidiaries contracts.

89.

There is a clear monetary incentive for ER doctors and Envision to up-code patients' charts. As up-coding increases, the higher Envision charges for treating ER patients,

---

[10] Envision's ED level 5 coding practices are fraudulently wrong. It is not limited to "grey area" level 5 coding where patients have a high-risk chief complaint but are not ultimately diagnosed with a life-threatening injury (e.g., patient complained of, but did not have a heart attack), but includes minor injuries like sprained ankles.

injuring all payers of medical services, including, but not limited to, Medicare, Medicaid, and Tricare.

**B.  Each Step in the ER Process is Utilized in Envision's Scheme.**

Envision maximizes the information on the chart and the nurse acuity score in each step of the Emergency Department process.  The following sections detail how Envision furthers their scheme from the moment a patient is transported to the ER, to the patient seeing the nurse and doctors, to Envision coders instructing physicians to revise their patients' charts, and finally to Envision submitting the bill for payment.  An example of how to read a patient's chart is demonstrated in Exhibit D.

**i.  Method of Patient's Transportation to ER**

91.  The method of transportation can contribute to the nurse acuity level. Transportation to the emergency department by an ambulance is rated as 10 points on the veEDIS nurse acuity system.  While sometimes ambulatory visits are in response to a life-threatening injury, they are often procedural.  For example, it is the nursing home's protocol that all patients, no matter the severity of symptoms, is transported via ambulance ("EMS" on patients' charts) to the emergency department.

For example, a 79-year-old female patient chart demonstrated she lived in a nursing home near Unity Medical Center and was transported to the ER on a stretcher via EMS even though her chief complaint was not life-threatening – "fall – no obvious injury."  Ex. E at 1.  In fact, the patient denied experiencing any pain during triage.  *Id.*  For this particular patient, the method of transportation was the third highest mark on the patient's acuity chart.  *See Id.*  at 4.  Furthermore, 20 additional acuity points were added for "DC – SNF," meaning the patient was discharged ("DC") back to her skilled nursing facility ("SNF").  *Id.*  In total, nearly one-third of the patient's nurse acuity score consisted of information that is irrelevant to the E/M Services codes.  This

patient ultimately received 95 nurse acuity points corresponding with a veEDIS level 5, which was copied to be the ED Level 5 as well. *Id.*

In another patient chart, a 92-year-old female, also living in a nursing home, was transported to the ER via EMS and stretcher. *See*, Ex. F at 1. Albeit the patient fell to the floor in the nursing home, she stated her symptoms were of mild severity and the chief complaint was "fall
93.
— no obvious injury." *Id.* Her method of transportation and discharge back to the nursing facility accounted for 30 of her total 84 nurse acuity points. *Id.* at 4. Again, she received a veEDIS level 5 and an ED Level 5. *Id.*

If the patient does not arrive by ambulance, the patient arrives by a privately-owned
94.
vehicle ("POV" on the patient's chart). *See e.g.*, Ex. G. There are no acuity levels added to the nurse's acuity chart for these arrivals.

95. The transportation method does not by itself indicate a comprehensive score for History, PE, or a high complexity MDM. There are no physicians involved in the actual transportation. Regardless, Envision's scheme relies heavily on the transportation to fulfill HCPCS Code 99825.

96. **ii.  Patient is Triaged by Triage Nurse**

Once the patient approaches the front desk in the ER to check-in, that patient is immediately triaged by a triage nurse to gather information about their vital signs and history of
97.
illness, which are recorded on the patient's chart.

Patients at Unity's ER are seen in the order of the severity of their symptoms, not in the order of arrival. The patient with the most severe symptoms will be seen first. The longer a patient must wait to be seen between a triage nurse and physician, generally the patient's symptoms are less emergent. The time lapse between triage and seeing a physician is a quick way

to see the severity of the symptoms and whether the patient can be justifiably coded at a high ED level.

Another way to gauge the severity of the disease in the triage stage is to look at the patient's vital signs ("VS") to see if they are within a normal range and to see if the person is ambulatory.[11]

98. It is the coder's responsibility to account whether the patient had a serious risk of injury. Upon information and belief, Envision coders purposefully ignore information, like the triage times and VS, that would prevent them from billing a HCPCS Code 99285.

99. During triage, the nurse always documents the chief complaint, the patient's VS, the history of present illness, and a description of symptoms. The extent to which the HPI is documented should depend on the nature of the chief complaint. The more severe the chief complaint, the more extended the HPI will be; the more minor the chief complaint, the briefer it will be.

100.

101. As mentioned, at Unity, nurses and physicians have learned the proper method to the history of the patients in the charts. After repeated phone calls and instruction from Envision to physicians to make the patient's charts more comprehensive, the physicians and nurses have been trained to chart aggressively.

102. The nurse has a checklist that they run through to ensure an extended history check. The nurse lists: whether the symptoms are present now, the severity of the symptoms, the medication the patient is taking, whether the symptoms are exacerbated or relieved by anything, the nature of associated signs and symptoms, and whether the patient was referred by another

---

[11] The Patient's medical charts use acronyms to describe this information. For example, in the Chief Complaint/History of Present Illness section of a 79-year-old male, he is described as ambulatory ("AMB"), with a temperature of 98.1, has a heart rate of 78 beats per minute, takes 20 unlabored breaths per minute, has a blood pressure of 133/73, has 97% oxygen saturation on room air, and feels no pain. Ex. G at 1.

health center. Even if the patient answers every question in a negative (i.e., symptoms not present now, symptoms not exacerbated by anything), the chart supports an extended HPI code. The patients have walked out of triage with an extended HPI and a chief complaint charted – two of the four categories in History analysis.

The veEDIS system is also implicated in the triage. The more a nurse checks the vital signs, the higher the physician ED level is. Nurses can mindlessly record every time they check[103] a patient's VS. Nurses press a single button that collects the patient's VS and concurrently adds the check to the veEDIS system. Consequently, many of the patients billed at an ED level 5 had their VS checked numerous times even with minor injuries or health problems. This practice was a common occurrence at Unity.

104. For example, a 79-year-old male patient arrived at the ER via POV and was AMB. Ex. G at 1. The chief complaint was "cough/chest congestion" and the patient stated he had zero pain. *Id.* The patient was sent by Fast Pace, an urgent care center, only to get an X-Ray.[12] *Id.* The patient had already been seen by a doctor and stated he had no further symptoms. *See Id.* Nonetheless, the nurse reviewed his present illness history. The patient stated that the symptoms were of mild severity and were not exacerbated by anything, and the nurse noted he had negative chest pain, negative fever, and negative hoarse voice among others. *Id.* This background was 105. taken unnecessarily and only to receive an extended HPI.

Further, the ER doctor saw the patient 35 minutes after he was triaged, suggesting the patient's symptoms were non-emergent. *Id.* By auditing the triage notes, it is clear that the patient was not at risk of a serious injury and did not have a life-threatening condition. The patient still received an ED Level 5. *Id.* at 5.

---

[12] If the patient required an emergency department, the urgent care center would send the patient to the emergency room by ambulance.

Contributing to the ED Level 5 rating was seven acuity points on the veEDIS system for checking the patient's VS. *Id.* These seven points were necessary to increase his point total to 83, slightly above the 81-point cut-off for a level 5 on the veEDIS system.

106. Additionally, another patient chart indicates a 42-year-old woman had chest pains of mild severity, and yet the number of times her VS were checked led to an increased ED level. Ex. H at 1. Her chief complaint was documented as "chest pain – atraumatic > 35 years" and stated that she has had "these 'attacks' for months." *Id.* Symptoms of "mild severity" that last "for months" do not justify an HCPCS Code 99284 or 99285, yet her VS were "checked" 10 times and contributed 12 acuity points. *Id.* at 4. She was also reassessed six times, resulting in an additional six acuity points. *Id.* These were 18 points of her 110 on the veEDIS system, corresponding with a level 5 nurse acuity score and were charted as an ED Level 5. *Id.* at 4-5.

### iii. ER Doctor Examines Patient and Makes Initial Assessment

108. The patient is seen by an ER doctor after triage and the doctor makes an initial assessment of the patient's condition. Specifically, the ER doctor conducts an ROS and a PE of the patient. The ROS is an inventory done on the patient's various bodily systems obtained by asking a series of questions to identify symptoms the patient may have experienced or has experienced. The ROS also marks the first time the ER doctor's actions contribute to the patient's
109.
chart.

Many of the patients' charts billed at an ED level 5 indicate "all (other) systems have been reviewed and are negative." *See e.g.*, Ex. D at 1. This blanket notation supports a

33

comprehensive level of ROS, as it infers that the physician reviewed all fourteen recognized systems.[13]

These ROS's were typically unnecessary or unreasonable given the patients' chief complaints and symptoms. In an emergency department, it is important to be thorough but expedient and Medicare reasonableness rules apply. These diverse systems should not all be considered when a chief symptom is relatively minor. For example, a 15-year-old female patient chart states that she entered the ER with a complaint of asthma and had been seen two days prior by a primary care physician at Unity. Ex. I at 1. Nonetheless, all her "(other) systems have been reviewed." *Id.* This means that the physician checked to ensure her integumentary system (skin) did not have any sores, hives, miles, etc. Upon information and belief, the integumentary system is not related to a condition of asthma.

111. In another patient chart, a 53-year-old male patient was ambulatory upon arrival to the ER and had a chief complaint of "flank pain." Ex. C at 1. Flank pain refers to discomfort in the upper abdomen or back and sides. The patient had repeatedly visited for the same complaint, and yet the attending physician noted on the chart "[a]ll (other) systems have been reviewed are negative." *Id.* All fourteen systems were unnecessary to review as the patient had a kidney stone, one of the most common causes of severe flank pain. *Id.* at 3. Upon information and belief, the
112.
ROS should have been constrained to common causes.

In a 41-year-old female patient chart, while the chief complaint was documented as "[abdominal] pain – generalized" the patient had all of her systems reviewed even though only one was found to be positive, and had already been noted in the "chief complaint" and "history of

---

[13] The fourteen systems are: constitutional symptoms (e.g., fever, weight loss); eyes; ears, nose, mouth, throat; cardiovascular; respiratory; gastrointestinal; genitourinary; musculoskeletal; integumentary (skin and/or breast); neurological; psychiatric; endocrine; hematologic/lymphatic; and allergic/immunologic.

present illness." Ex. J at 1. In other words, the extensive ROS found no new information about the patient and was thus unreasonably conducted at the level it was done.

Not only were the ROS checks unnecessary and unreasonable, but, upon information and belief, the physician or nurse also did not review all other systems.

113. Upon information and belief, physicians and nurses were trained to include this statement whether the ROS was performed or not.

114. Relator Florence saw patients with charts that said "all (other) systems have been reviewed and are negative." However, after interacting with these patients, Relator Florence
115. learned that the systems were not in fact negative. Relator Florence learned the patients had medication that contradicted the negative diagnoses and he had previously tended to other patients in outpatient settings and knew they suffered from a condition that contradicted the negative diagnoses.

116. Falsely stating that the systems have been reviewed and are negative is a false certification and is also dangerous. A physician treating the patient may not consider a diagnosis because they relied on the patient's chart. Alternatively, they might make a diagnosis that would not be prudent considering the patient's systems were not in fact negative. Upon information and belief, Envision, through its fraudulent coding, affected the healthcare patients received in
117. hospitals.

The final components of the History is the Past Family and Social History. For a complete charting of the PFSH two of past history, family history and social history need to be reviewed. While the past history (i.e., medical and surgical history) is often completed, the family history and social history sometimes simply state that they have been reviewed. For example, a common notation is "Family History has been reviewed and is not pertinent" or "Social history is

35

negative for alcohol and tobacco use." *See, e.g.*, Ex. C at 1; Ex. F at 1. Upon information and belief, the social history or family history is sometimes not completed but noted that it had been reviewed.

The second evaluation the ER doctor needs to perform and chart comprehensively is the physical exam. According to the 1997 Guidelines, the type and content of the examination are selected by the examining physician and are based upon the clinical judgment, the patient's history, and the nature of the presenting problem. For a comprehensive exam, the physician must either examine nine (eight in the 1995 guidelines) organ systems or perform each identified exam in the Guidelines for a single organ system. The organ systems include: cardiovascular; ears, nose, mouth, and throat; eyes; genitourinary (female); genitourinary (male); hematologic/lymphatic/immunologic; musculoskeletal; neurological; psychiatric; respiratory; and skin.

119.      Upon information and belief, ER doctors performed unnecessary and unreasonable PEs to satisfy the comprehensive requirements.

120.      Upon information and belief, Envision coders pressure physicians into performing the unnecessary and unreasonable PEs through their constant badgering after they receive an "insufficient" chart from a physician.

121.      For example, a 71-year-old female patient was charted as having chief complaint of "hypertension – reported" (or more commonly known as "high blood pressure") with symptoms of only mild dizziness. Ex. K at 1. The patient was in no acute distress and her heart was stated to be at a regular rate and rhythm at the time of the assessment. *Id.* The physician nonetheless charted eleven systems, including her skin which was noted as "warm and dry with normal turgor, without legions or rashes." *Id.* at 2. Upon information and belief, there was no suspicion that her

skin condition was the cause of the hypertension and her skin condition was not in fact the cause of it.

In other cases, the physical examination is reasonable and necessary, but does not cover at least eight organ systems or all elements within an organ system. Upon information and belief, Envision still coded these patients for a HCPCS Code 99285. These codes are fraudulent and do not meet the Medicare guideline standards.

122.

For example, in a 61-year-old female patient chart, the patient had a chief complaint of "[abdominal] pain – lower, female non childbearing," and her PE included only two systems.

123.

Ex. L at 1. These systems had general notes like "vital signs noted" and "mild diffuse tenderness without localization." *Id.* The PE did not support a comprehensive score. However, the patient was coded as an ED level 5, and upon information and belief, the patient was billed for a HCPCS Code 99285. *Id.* at 6.

### iv. Physician Orders Diagnostic Tests.

124.

Once the ROS and PE are complete, the hospital administers diagnostic tests on the patient based on the attending ER doctor's test orders. According to the "Physician Orders" section of the patients' charts, many of the ordered tests are unnecessary given the condition of the patient at the time the tests are administered.

125.

These unnecessary tests have a twofold purpose: first, it increases the appearance of a medically complex decision; second, many of the tests contribute to the acuity point total. However, the tests ordered are unnecessary and the results are, as expected, often within normal limits. These tests do not increase the complexity of the medical decision making and should not be considered in the HCPCS Code analysis.

126.

For example, 54-year-old ambulatory male patient was charted as having chief complaint of "congestion – head, nose, chest." Ex. M at 1. While there was no concern of a heart

condition, the physician ordered an electrocardiogram ("EKG"). *Id.* at 4. Unsurprisingly, the EKG was within normal limits. *See Id.* at 3. The EKG counted for 5 of the 114 points in the veEDIS system, enough for a nurse acuity level 5. *Id.* at 5. The patient received an ED Level 5 and upon information and belief, Envision coded the patient for a HCPCS Code 99285.

127. In another example, a 79-year-old male patient chart stated that the patient arrived at the emergency department from the urgent care center only to receive an x-ray. Ex. G at 1. He left the hospital after receiving EKG, a comprehensive metabolic profile ("CMP"), and other lab tests in addition to the x-ray. *Id.* at 3-4. The additional tests were unnecessary as the patient had already been seen by a doctor and had no further symptoms.

128. These tests were not only unnecessary, but they were not indicative of a medically complex decision making. These unnecessary ordered tests came back within normal limits. The physician was tasked with the same level of decision-making complexity as existed prior to the tests being performed.

129. The unnecessary tests also caused different doctors, like radiologists, to bill medical payers, including Medicare, Medicaid, and other Government-funded health care programs.

130. Further, physician orders were often ordered by nurses through standard protocols. These tests increase the nurse acuity chart (as it is a nurse activity) but is not related to the complexity of the medical decision making. For example, a nurse ordered nine total protocol labs for a 53-year-old male in the emergency department (i.e., "[by: dmartin, Protocol]"). Ex. C at 3-4. Upon information and belief, these protocol orders were ordered by the nurse without consultation with the physician. The protocoled labs and IV ordered increased the patient's veEDIS score by over 20 points to a total of 82. *Id.* at 8. This was slightly higher than the nurse acuity level 5 threshold of 81. The patient received an ED level 5. *Id.* at 9.

The physician and nurses only ordered a urinalysis for the 79-year-old female patient. Ex. E at 3. This was counted on the veEDIS system under "specimens collected." *Id.* at 4. There was also another five points added on the veEDIS system for "Department: Labs." *Id.* Nowhere[131] on the patient chart is there a reference to any additional lab work, but it was included in the veEDIS system. This counted towards 95 total points and a nurse acuity level 5, and thus, an ED level 5. *Id.*

Another example of a nurse action, unrelated to the physician, is the ordering of an IV.[132] Often, the nurse will order the IV prior to the patient being seen by the physician. Other times, the patient will not receive any fluids through the IV, but one is set up in a precautionary manner. Regardless, the IV insertion is worth 15 nurse acuity points and each order reassessment is worth an additional point. A 51-year-old-male patient chart stated that the nurse ordered him an IV, but was never used.[14] Ex. N at 3. He was instead only given medication to take home. *Id.* While the IV was unused, it counted for 15 points and the nurses reassessed the IV four additional times for four more points. *Id.* at 4. This patient barely reached the nurse acuity level 5 threshold of 81 with 84 points.[133] He still received an ED Level 5. *Id.* at 5.

Unnecessary and unreasonable tests ordered by physicians and tests only ordered by nurses do not increase the complexity of the medical decision and cause the submission of false claims[134] by other doctors, like radiologists.

v.     **ER Doctor Diagnoses Patient.**

Once the patient undergoes the ER doctor's ordered medical tests and the physician receives the results, the physician diagnoses the patient's symptoms. According to the 1997 Guidelines, the complexity of medical decision making is measured by: the number of possible

_____

[14] There was no medication ordered that would be administered to the patient through an IV.

39

diagnoses and/or the number of management options that must be considered; the amount and/or complexity of medical records, diagnostic tests, and/or other information that *must* be obtained, reviewed and analyzed; and the risk of significant complications, morbidity and/or mortality. For a HCPCS Code 99285, there must be an extensive number of diagnoses or management options, an extensive amount and/or complexity of data to be reviewed and a high risk of complications and/or morbidity or mortality.

135. Envision consistently billed for HCPCS codes 99284 and 99285 without the requisite level of complexity of the medical decision making on the charts. Patients have entered the emergency department with one condition with little risk of complications and/or morbidity or mortality. The physicians frequently listed the original chief complaint, or a similar description, as the patient's diagnosis. Descriptions of the patient's symptoms are inappropriate and improper to list as official diagnoses as the latter are meant to list a specific condition of the patient's symptoms. This further exemplifies that many of the tests ordered were medically unnecessary and unreasonable and were only ordered to give the appearance of an increased amount of data to be reviewed by the physician.

136. Envision's up-coding is exemplified in a 51-year-old male's patient chart. Ex. N at 1. This patient was ambulatory upon arrival to the ER and had a chief complaint of "diarrhea – adult (mild)." *Id.* He was diagnosed with "bowel spasm" – nearly identical to the chief complaint. *Id.* at 3. There were no other factors that increased the complexity of the decision making. All tests came back negative, the ROS was negative (other than abdominal pain), the PE stated the patient was well nourished and was in no acute distress, and there was an IV inserted but not used. *Id.* at 1. The patient was discharged to return home with some medications. *Id.* at 3.

There was no risk of complications or morbidity, the number of diagnosis was limited, and there was barely any relevant data to be reviewed. The patient had a veEDIS score of 84 which equated to a nurse acuity level 5 and was charted as ED level 5. *Id.* 4-5. Upon information and belief, the patient should have been billed instead for an HCPCS code 99282. [137.]

In another patient's chart, a 25-year-old female patient complained of hyperglycemia, but tests from the Emergency Medical Services showed that her glucose level was normal. Ex. O at 3. She complained that the onset of hyperglycemia was one day prior to arrival, indicating that it was not urgent. *Id.* at 1. The patient denied pain of any kind and did not describe a single symptom. The ROS was all negative and the PE stated the patient was in "no acute distress." *Id.* All the labs further came out negative. *Id.* at 2-3. Upon information and belief, there was nothing wrong with her. The patient left before the labs returned, but, upon information and belief, yet she was billed at an HCPCS Code 99284, which would equal the nurse acuity level 4 and the ED level 4 on her chart. Upon information and belief, the patient should have been billed instead for an HCPCS code 99281. [138.]

### vi. Attending Physician Provides Instructions to Patient and Patient is Discharged from the Hospital with Copies of Discharge Summary.

[139.]

The patient is discharged from the hospital after the attending ER physician provides the patient with instructions to care for their condition and symptoms moving forward. It is standard practice for the physician to refer the patient to a general practitioner. The physician also instructs the patient to return to the hospital immediately if their symptoms worsen.

Upon information and belief, patient's returning for the same symptoms were simply another cog in Envision's fraudulent scheme. For example, the first page of a patient chart demonstrates that a 21-year-old female patient had minor flu symptoms. Ex. P at 1. The diagnosis was acute bronchitis and acute sinusitis and was treated with one antibiotic (the PE did not

41

document the requisite findings for a bronchitis or sinusitis diagnosis). *See Id.* at 2. Prior to discharge, the patient was instructed and agreed "to return immediately if symptoms worsen or fail to improve" without any referral to a general practitioner. *Id.* This patient was assessed at an ED Level 4 and, upon information and belief, Envision billed her for a HCPCS Code 99284. *Id.* at 4.

Patients who reside in nursing homes are further harmed by Envision's recommendation to return to the hospital. Some nursing home policies automatically require the patient[141] not only to go to the hospital when a medical situation arises regardless of the level of urgency. Page 3 of the 79-year-old female patient chart states that the patient from the nursing home was instructed and agreed "to return immediately if symptoms worsen or fail to improve." Ex. E. Nursing home patients, as mentioned, are at an increased risk of receiving an HCPCS Code 99285 as the ambulance to and from the emergency room add 30 points to the nurse acuity level, about halfway to the nurse acuity level 5 threshold of 81.

### vii. Patient's Chart is Sent to Envision Coder for Code Evaluation

142.
A patient's chart is sent to a coder who works for Envision to finalize the HCPCS code. If the contents of the chart do not warrant an ED level 5, the coder will return the chart to the attending physician with specific instructions regarding how to revise the chart. Ex. Q. In fact, Envision will notify the physician the amount of money lost as a result of the physician's original notes on the chart.

143.
Relator Dr. David Florence has received emails from Envision describing "quarterly down code reports." The purpose of these reports is to advise Relator Florence to up-code the patient charts he originated so they meet the standard to justify HCPCS Code 99285. Additionally, Envision has included spreadsheets in these emails indicating the amount of money Envision lost due to Dr. Florence's original charts. *See* Ex. R.

42

On three separate occasions in 2017 and once in 2018, Relator Florence received emails from Wendy Graham, an employee of Envision Healthcare, with Lisa Elizabeth Walker, an employee of Envision, carbon copied. In the 2017 email, Ms. Graham wrote:

144.     Our benchmark is to have less than 0.75% of our charts down-coded. Each quarter, you will receive documentation feedback, with the chart attached, to see how you can decrease the number of your charts that are down-coded.

Ex. S.

Later, Ms. Graham wrote in an April 4, 2018 email:

145.     Our benchmark is to have less than 0.5% of our charts down-coded. Your charts were down coded from a level 5 to a level 4 due to missing or incomplete [physical examination] elements. As a reminder, for high acuity encounters, please document organ systems for [physical examination].

Ex. T.

146.     Upon information and belief, Envision sets the policy to only have a fraction of the charts that are unable to meet the HCPCS Code 99285 requirements (Envision's "down-coding policy").

147.     Upon information and belief, Envision requires its coders to harass doctors to chart falsely in order to meet Envision's down-coding policy.

148.     Upon information and belief, Defendants' fraud is part of a national scheme at medical facilities that contract with Envision to defraud Medicare, Medicaid and other Government-funded health care programs.

**C.     Amount of Overpayments**

149.     Upon information and belief, Envision engaged in this fraudulent scheme in every hospital with which it or its subsidiary subcontracts across the United States. Envision has over 25,000 clinicians in the 48 contiguous states and Hawaii. This fraudulent scheme is nationwide.

43

Further, the scheme targets a large patient base. There are 136.9 million people that enter the emergency room each year. EMERGENCY DEPARTMENT VISITS, CDC (Jan. 19, 2017), https://www.cdc.gov/nchs/fastats/emergency-department.htm. If Envision's fraudulent scheme targets [150.] even a portion of the 136.9 million people each year, it is defrauding the United States Government millions of dollars.

Envision charges insurance companies $2,257.00 for HCPCS Code 99285, $1,515.00 for Code 99284, and $1,017.00 for Code 99283. Many patients are covered by multiple forms of Government insurance and each insurer can be charged for one HCPCS Code. [151.] For example, if a patient is insured by Medicare and TennCare and is billed for a HCPCS Code 99285, it is Medicare's policy to only reimburse $176.23 for that code. After receiving the payment from Medicare, Envision will request over $2000 from TennCare, and TennCare will pay a portion of that total. For each HCPCS Code, Envision can defraud multiple Government funded health plans. Upon information and belief, Envision will "write-off" the amount that it does not get reimbursed for. [152.]

Envision also causes physicians and nurses to order unnecessary tests for patients. Radiologist and other non-Envision doctors bill these tests, like x-rays, to Government funded health plans. Envision causes these doctors to make false claims for payment. [153.]

Relators do not know when Envision began this practice, but know that the practice was in effect when Envision contracted to work with Unity.

# CAUSES OF ACTION

## COUNT I:

### Defendants Violated the Federal False Claims Act

### 31 SC § 3729(A)(1)(A)

Relators reallege and incorporate by reference the allegations in all previous paragraphs of this Complaint.

154. Relators seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

155. As described above, Defendants have knowingly made, used, or caused to be made or used false records and statements material to false or fraudulent claims paid or approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

156.

157. As a result of these false claims, the United States has been damaged in a substantial amount and continues to be damaged, in an amount yet to be determined.

158. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.

## COUNT II:

### Defendants Violated the California False Claims Act

159.

### Cal. Gov't Code 12651(a)(1)-(2)

160. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

This claim is for penalties and treble damages under the California False Claims Act.

45

By virtue of the acts described above, Defendants have presented false claims for payment or approval under Medicaid and other California State-funded programs to officers or employees of the State within the meaning of Cal. Gov't Code § 12651(a)(1). Defendants also caused[161] to be made or used false records or statements material to the false or fraudulent claims within the meaning of Cal. Gov't Code § 12651(a)(2).

Under California law, the State Medicaid program may withhold payment based upon "fraud or willful misrepresentation by a provider." Cal. Welf. & Inst. Code § 14107.11(a)(2). [162] Fraud is defined as intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or herself or some other person. It includes any act that constitutes fraud under applicable federal or state law." *Id.* § 14043.1(i). Fraud is grounds for suspension from California's Medicaid program. *Id.* § 14123.

[163]    California's Medicaid provider agreement, which providers must sign in order to participate, requires them to agree "to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code." Chapter 7 includes a restriction of Medi-Cal services to those medically necessary to protect life, to prevent significant disability or illness, or to alleviate severe pain. [164] Cal. Welf. & Inst. Code § 14059.5.

Compliance with these provisions is an essential condition for participation in Medicaid and other California health programs and for the payment of claims. Claims submitted in violation of these provisions are not eligible for reimbursement. When a provider submits a claim for payment, it is representing or certifying compliance with these conditions. The California State Government would not pay claims that it knew were tainted by false or fraudulent representations of compliance.

The California State Government approved, paid and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

165.     Therefore, the State of California has been damaged in an amount to be proven at trial and is entitled to treble that amount.

166.     Additionally, the State of California is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising
167.
from their fraudulent conduct as described herein.

## COUNT III:

## Defendants Violated the California Insurance Frauds Prevention Act

### Cal. Insurance Code § 1871.7

168.     Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

169.     As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims in violation of California Insurance Code § 1871.7(b) by knowingly violating California Penal Code § 550. Defendants have engaged in some or all of the following acts:

    a.  Knowingly made or caused to be made false or fraudulent claims for payment of a health care benefit; or

    b.  Knowingly prepared, made or subscribed writings, with the intent to present or use them, or allow them to be presented, in support of a false or fraudulent claim; or

    c.  Presented or caused to be presented written or oral statements as part of, or in support of claims for payment or other benefit pursuant to an insurance policy,

knowing that the statements contained false or misleading information concerning

material facts; or

d. Knowingly presented or caused to be presented false or fraudulent claims for the

payment of a loss or injury under a contract for insurance; or

e. Aiding, abetting, soliciting, assisting or conspiring with any person to engage in

any of the above.

Cal. Penal Code § 550.

As a result of such conduct on the part of Defendants, Plaintiffs/Relators, the State of California, and the People of the State of California have been damaged in substantial amounts and are entitled to damages and penalties in accordance with California Insurance Code § 1871.7 in an amount to be determined at trial.

## COUNT IV

### Defendants Violated the Colorado Medicaid False Claims Act

#### Colo. Rev. Stat. § 25.5-4-303 *et seq.*

171.

Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Colorado, in violation of Colo. 20 Rev. Stat. § 25.5-4-303 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Colorado State-funded programs to officers or employees of the State within the meaning of Colo. Rev. Stat. § 25.5-4-303 *et seq.*.

48

Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Colo. Rev. Stat. § 25.5-4-303 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendant that were obtained through their fraudulent conduct.

174.

The Colorado State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for the fraudulent conduct of Defendants.

175.

As a result of the Defendants' actions as set forth above in this Complaint, the State of Colorado has been, and continues to be, severely damaged.

176.

Additionally, the State of Colorado is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

177.

## COUNT V:

## Defendants Violated the Connecticut False Claims Act for Medical Assistance Programs

178.

### Conn. Gen. Stat. § 4-275 *et seq.*

Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

179.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Connecticut, in violation of Conn. Gen. Stat. § 4-275 *et seq.*.

180.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Connecticut State-funded programs to officers or employees of the State within the meaning of Conn. Gen. Stat. § 4-275 *et seq.*.

49

Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Conn. Gen. Stat. § 4-275 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were improperly performed.

181. The Connecticut State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for the fraudulent conduct of Defendants.

182.

As a result of the Defendants' actions as set forth above in this Complaint, the State of Connecticut has been, and continues to be, severely damaged.

183.

Additionally, the State of Connecticut is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct described herein.

184.

## COUNT VI:

## Defendants Violated the Delaware False Claims and Reporting Act

185. ### 6 Del. C. § 1201

Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

186.

187. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Delaware, in violation of 6 Del. C. § 1201.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Delaware State-funded programs to officers or employees of the State within the meaning of 6 Del. C. § 1201. Defendants also caused

to be made or used false records or statements material to the false or fraudulent claims within the meaning of 6 Del. C. § 1201.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

188. The Delaware State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

189. As a result of the Defendants' actions as set forth above in this Complaint, the State of Delaware has been, and continues to be, severely damaged.

Additionally, the State of Delaware is entitled to the maximum penalty of $11,000

191. for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT VII:

## Defendants Violated the Florida False Claims Act

192. **Fla. Stat. Ann. § 68.081 *et seq.***

193. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

194. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Florida, in violation of Fla. Stat. 14 Ann. § 68.081 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Florida State-funded programs to officers or employees of the State within the meaning of Fla. Stat. Ann. § 68.081 *et seq.*.

Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Fla. Stat. Ann. § 68.081 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

195. The Florida State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

196. As a result of the Defendants' actions as set forth above in this Complaint, the State of Florida has been, and continues to be, severely damaged. Additionally, the State of Florida is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT VIII:

### Defendants Violated the Georgia State False Medicaid Claims Act

### Ga. Code Ann. § 49-4-168 *et seq.*

198. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

199. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Georgia, in violation of Ga. Code Ann. § 49-4-168 *et seq.*.

200. By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Georgia State-funded programs to officers or employees of the State within the meaning of Ga. Code Ann. § 49-4-168 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Ga. Code Ann. § 49-4-168 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

The Georgia State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

As a result of the Defendants' actions as set forth above in this Complaint, the State of Georgia has been, and continues to be, severely damaged.

Additionally, the State of Georgia is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT IX:

### Defendants Violated the Hawaii False Claims Act

### Haw. Rev. Stat. § 661-21 *et seq.*

Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Hawaii, in violation of Haw. Rev. Stat. § 661-21 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Hawaii State-funded programs to officers or employees of the State within the meaning of Haw. Rev. Stat. § 661-21 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Haw. Rev. Stat. § 661-21 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conducts.

The Hawaii State Government approved, paid, and continues to approve and pay
208.
claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.
209.

As a result of the Defendants' actions as set forth above in this Complaint, the State of Hawaii has been, and continues to be, severely damaged.
210.

Additionally, the State of Hawaii is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT X:

### Defendants Violated the Illinois False Claims Act

### 740 Ill. Stat. § 175 *et seq.*

212.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly
214.
submitted false claims to the State of Illinois, in violation of 740 Ill. Comp. Stat. § 175 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Illinois State-funded programs to officers or employees of the State within the meaning of 740 Ill. Comp. Stat. § 175 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of 740 Ill. Comp. Stat. § 175 *et seq.*.

54

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

The Illinois State Government approved, paid, and continues to approve and pay

215.
claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

216.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Illinois has been, and continues to be, severely damaged.

217.
Additionally, the State of Illinois is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XI:

## Defendants Violated the Illinois Insurance Claims Fraud Prevention Act

### 740 Ill. Comp. Stat. 92/1(a)

219.
By virtue of the acts described above, Defendants intentionally and repeatedly violated Illinois Insurance Claims Fraud Prevention Act by knowingly violating in 740 Ill. Comp. Stat. Ann. 92/5(a). Defendants have engaged in some or all of the following acts. Under Section 5, a person or entity commits insurance fraud when they:

   a. Knowingly offers or pays any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.

A person who violates the Illinois Insurance Claims Fraud Prevention Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 1961 is liable civil penalties under 740 Ill. Comp. Stat. Ann. 92/5(b).[15]

220. As a result of such conduct on the part of Defendants, Plaintiffs/Relators, the State of Illinois, and the People of the State of Illinois have been damaged in substantial amounts and are entitled to treble damages and civil penalties in accordance with 740 Ill. Comp. Stat. Ann. 92/5(b) in an amount to be determined at trial.

## COUNT XII:

### Defendants Violated the Indiana False Claims and Whistleblower Protection Act

### Ind. Code Ann. § 5-11-5.7-1 *et seq.*

222. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

223. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Indiana, in violation of Ind. Code Ann. § 5-11-5.7-1 *et seq.*.

224. By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Indiana State-funded programs to officers or employees of the State within the meaning of Ind. Code Ann. § 5-11-5.7-1 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Ind. Code Ann. § 5-11-5.7-1 *et seq.*.

---

[15] A person or entity commits insurance fraud as defined by the Criminal Code of 2012 when they "[k]nowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property" and when they "[k]nowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider." 720 Ill. Comp. Stat. Ann. 5/17-10.5(a)(2).

56

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

225.
The Indiana State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

226.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Indiana has been, and continues to be, severely damaged.

227.
Additionally, the State of Indiana is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XIII:

### Defendants Violated the District of Columbia False Claims Act

### D.C. Code Ann. § 2-308.14 *et seq.*

229.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

230.
As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the District of Columbia, in violation of D.C. Code Ann. § 2-308.14 *et seq.*.

231.
By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other District of Columbia-funded programs to officers or employees of the District within the meaning of D.C. Code Ann. § 2-308.14 *et seq.*. *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of D.C. Code Ann. § 2-308.14 *et seq.*.

57

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

232. The District of Columbia Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

233. As a result of the Defendants' actions as set forth above in this Complaint, the District of Columbia has been, and continues to be, severely damaged.

234. Additionally, the District of Columbia is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XIV:

### Defendants Violated the Iowa False Claims Act

### Iowa Code § 685.1 *et seq.*

236. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

237. As a result of the foregoing conduct, Defendants knowingly and improperly submitted false claims to the State of Iowa, in violation of Iowa Code § 685.1 *et seq.*.

238. By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Iowa State-funded programs to officers or employees of the State within the meaning of Iowa Code § 685.1 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Iowa Code § 685.1 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

239. The Iowa State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

240. As a result of the Defendants' actions as set forth above in this Complaint, the State of Iowa has been, and continues to be, severely damaged.

241. Additionally, the State of Iowa is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XV:

### Defendants Violated the Louisiana Medical Assistance Programs, ex rel

### La. Rev. Stat. § 46:437.1 *et seq.*

243. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly 245. submitted false claims to the State of Louisiana, in violation of La. Rev. Stat. § 46:437.1 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Louisiana State-funded programs to officers or employees of the State within the meaning of La. Rev. Stat. § 46:437.1 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of La. Rev. Stat. § 46:437.1 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

The Louisiana State Government approved, paid, and continues to approve and pay 246. claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

247.

As a result of the Defendants' actions as set forth above in this Complaint, the State of Louisiana has been, and continues to be, severely damaged.

248.

Additionally, the State of Louisiana is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XVI:

### Defendants Violated the Maryland False Health Claims Act

### MD Code Ann. § 2-601 *et seq.*

250.

Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly 252. submitted false claims to the State of Maryland, in violation of MD Code Ann. § 2-601 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Maryland State-funded programs to officers or employees of the State within the meaning of MD Code Ann. § 2-601 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of MD Code Ann. § 2-601 *et seq.*.

60

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of Defendants' fraudulent conduct.

253.

The Maryland State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

254.

As a result of the Defendants' actions as set forth above in this Complaint, the State of Maryland has been, and continues to be, severely damaged.

255.

Additionally, the State of Maryland is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their improper conduct.

## COUNT XVII:

### Defendants Violated the Massachusetts False Claims Law

### Mass Gen Laws ch.12 § 5 *et seq.*

257.

Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

258.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Massachusetts, in violation of Mass Gen Laws ch.12 § 5 *et seq..*

259.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Massachusetts State-funded programs to officers or employees of the State within the meaning of Mass Gen Laws ch.12 § 5 *et seq..* Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Mass Gen Laws ch.12 § 5 *et seq..*

61

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

260. The Massachusetts State Government approved, paid and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

261. As a result of the Defendants' actions as set forth above in this Complaint, the State of Massachusetts has been, and continues to be, severely damaged.

262. Additionally, the State of Massachusetts is entitled to the maximum penalty of $1,5,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XVIII:

### Defendants Violated the Michigan Medicaid False Claim Act

### Mich. Comp. Laws. § 400.601 *et seq.*

264. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

265. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Michigan, in violation of Mich. Comp. Laws. § 400.601 *et seq.*.

266. By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Michigan State-funded programs to officers or employees of the State within the meaning of Mich. Comp. Laws. § 400.601 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Mich. Comp. Laws. § 400.601 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

267.
The Michigan State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

268.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Michigan has been, and continues to be, severely damaged.

269.
Additionally, the State of Michigan is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XIX:

### Defendants Violated the Minnesota False Claim Act

### Minn. Stat. § 15C.01 *et seq.*

271.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

272.
As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Minnesota, in violation of Minn. Stat. § 15C.01 *et seq.*.

273.
By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Minnesota State-funded programs to officers or employees of the State within the meaning of Minn. Stat. § 15C.01 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Minn. Stat. § 15C.01 *et seq.*.

63

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result their fraudulent conduct.

274.
The Minnesota State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

275.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Minnesota has been, and continues to be, severely damaged.

276.
Additionally, the State of Minnesota is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XX:

### Defendants Violated the Montana False Claims Act

### Mont. Code Ann. § 17-8-403 *et seq.*

278.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly

280.
submitted false claims to the State of Montana, in violation of Mont. Code Ann. § 17-8-403 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Montana State-funded programs to officers or employees of the State within the meaning of Mont. Code Ann. § 17-8-403 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Mont. Code Ann. § 17-8-403 *et seq.*.

64

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

281.
The Montana State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

282.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Montana has been, and continues to be, severely damaged.

283.
Additionally, the State of Montana is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their improper conduct.

## COUNT XXI:

## Defendants Violated the Nevada False Claims Act

## Nev. Rev. Stat. Ann. § 357.010 *et seq.*

285.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

286.
As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Nevada, in violation of Nev. Rev. Stat. Ann. § 357.010 *et seq.*.

287.
By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Nevada State-funded programs to officers or employees of the State within the meaning of Nev. Rev. Stat. Ann. § 357.010 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Nev. Rev. Stat. Ann. § 357.010 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

288. The Nevada State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

289. As a result of the Defendants' actions as set forth above in this Complaint, the State of Nevada has been, and continues to be, severely damaged.

290. Additionally, the State of Nevada is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their improper conduct.

## COUNT XXII:

### Defendants Violated the New Hampshire False Claims Act

### N.H. Rev. Stat. Ann. § 167:61-b *et seq.*

292. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of New Hampshire, in violation of N.H. Rev. Stat. Ann. §

294. 167:61-b *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other New Hampshire State-funded programs to officers or employees of the State within the meaning of N.H. Rev. Stat. Ann. § 167:61-b *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Nev. Rev. Stat. Ann. § 357.010 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

295. The New Hampshire State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for defendants' fraudulent conduct.

296. As a result of the Defendants' actions as set forth above in this Complaint, the State of Nevada has been, and continues to be, severely damaged.

297. Additionally, the State of Nevada is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXIII:

### Defendants Violated the New Jersey False Claims Act

### N.J. Stat. § 2A:32C-1, *et seq.*

299. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

300.

301. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of New Jersey, in violation of N.J. Stat. § 2A:32C-1, *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other New Jersey State-funded programs to officers or employees of the State within the meaning of N.J. Stat. § 2A:32C-1, *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of N.J. Stat. § 2A:32C-1, *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained as a result of their fraudulent conduct.

302.
The Nevada State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

303.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Nevada has been, and continues to be, severely damaged.

304.
Additionally, the State of Nevada is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## **COUNT XXIV:**

## **Defendants Violated the New Mexico Fraud Against Taxpayers Act**

### **N.M. Stat Ann. § 44-9-1 *et seq.***

306.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

307.
As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of New Mexico, in violation of N.M. Stat Ann. § 44-9-1 *et seq.*.

308.
By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other New Mexico State-funded programs to officers or employees of the State within the meaning of N.M. Stat Ann§ 44-9-1 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of N.M. Stat Ann. § 44-9-1 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

309. The New Mexico State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

310. As a result of the Defendants' actions as set forth above in this Complaint, the State of New Mexico has been, and continues to be, severely damaged.

311. Additionally, the State of New Mexico is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXV:

### Defendants Violated the New Mexico Medicaid False Claims Act

#### N. M. Stat Ann. § 27-2F-1 *et seq.*

313. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of New Mexico, in violation of N.M. Stat Ann. § 27-2F-1 *et*

315. *seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other New Mexico State-funded programs to officers or employees of the State within the meaning of N.M. Stat Ann. § 27-2F-1 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of N.M. Stat Ann. § 27-2F-1 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

316. The New Mexico State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

317. As a result of the Defendants' actions as set forth above in this Complaint, the State of New Mexico has been, and continues to be, severely damaged.

318. Additionally, the State of New Mexico is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXVI:

### Defendants Violated the New York False Claims Act

### N.Y. State Fin. § 187 *et seq.*

320. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly 322. submitted false claims to the State of New York, in violation of N.Y. State Fin. § 187 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other New York State-funded programs to officers or employees of the State within the meaning of N.Y. State Fin. § 187 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of N.Y. State Fin. § 187 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

The New York State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

323.

324.

As a result of the Defendants' actions as set forth above in this Complaint, the State of New York has been, and continues to be, severely damaged.

325.

Additionally, the State of New York is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

326.

## COUNT XXVII:

## Defendants Violated the North Carolina False Claims Act

## N.C.G.S. § 1-605 *et seq.*

327.

Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

328.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of North Carolina, in violation of N.C.G.S. § 1-605 *et seq.*.

329.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other North Carolina State-funded programs to officers or employees of the State within the meaning of N.C.G.S. § 1-605 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of N.C.G.S. § 1-605 *et seq.*.

71

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

330.
The North Carolina State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

331.
As a result of the Defendants' actions as set forth above in this Complaint, the State of North Carolina has been, and continues to be, severely damaged.

332.
Additionally, the State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their improper conduct.

## COUNT XXVIII:

### Defendants Violated the Oklahoma Medicaid False Claims Act

### Okla. Stat. Tit. 63 § 5053 *et seq.*

334.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

335.
As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Oklahoma, in violation of Okla. Stat. Tit. 63 § 5053 *et seq.*.

336.
By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Oklahoma State-funded programs to officers or employees of the State within the meaning of Okla. Stat. Tit. 63 § 5053 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Okla. Stat. Tit. 63 § 5053 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

337.
The Oklahoma State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants fraudulent conduct.

338.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Oklahoma has been, and continues to be, severely damaged.

339.
Additionally, the State of Oklahoma is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their improper conduct.

## COUNT XXIX:

### Defendants Violated the Rhode Island State False Claims Act

### R.I. Gen. Laws. § 9-1.1-1 *et seq.*

341.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

342.
As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Rhode Island, in violation of R.I. Gen. Laws. § 9-1.1-1 *et seq.*.

343.
By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Rhode Island State-funded programs to officers or employees of the State within the meaning of R.I. Gen. Laws. § 9-1.1-1 *et seq.*. Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of R.I. Gen. Laws. § 9-1.1-1 *et seq.*.

73

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

344.
The Rhode Island State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

345.
As a result of the Defendants' actions as set forth above in this Complaint, the State of Rhode Island has been, and continues to be, severely damaged.

346.
Additionally, the State of Rhode Island is entitled to the maximum penalty of $13,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXX:

### Defendants Violated the Tennessee Medicaid False Claims Act

### Tenn. Code Ann. § 4-18-101 *et seq.* and § 71-5-181 *et seq.*

348.
Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

349.
As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Tennessee, in violation of Tenn. 11 Code Ann. § 4-18-101
350.
*et seq.* and § 71-5-181 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Tennessee State-funded programs to officers or employees of the State within the meaning of Tenn. Code Ann. § 4-18-101 *et seq.* and § 71-5-181 *et seq.*. Defendants also caused to be made or used false records or statements material

74

to the false or fraudulent claims within the meaning of Tenn. Code Ann. § 4-18-101 *et seq.* and § 71-5-181 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

351. The Tennessee State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

352. As a result of the Defendants' actions as set forth above in this Complaint, the State of Tennessee has been, and continues to be, severely damaged. Additionally, the State of Tennessee is entitled to the maximum penalties of $11,000 and $25,000, respectively, for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXXI:

### Defendants Violated the Texas Medicaid Fraud Prevention Law

354. **Tex. Hum. Res. Code Ann. § 36.001 *et seq.***

355. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Texas, in violation of Tex. Hum. Res. Code Ann. § 36.001 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Texas State-funded programs to officers or employees of the State within the meaning of Tex. Hum. Res. Code Ann. § 36.001 *et seq.*.

Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Tex. Hum. Res. Code Ann. § 36.001 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

357. The Texas State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

358. As a result of the Defendants' actions as set forth above in this Complaint, the State of Texas has been, and continues to be, severely damaged.

359. Additionally, the State of Texas is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

360.

## COUNT XXXII:

### Defendants Violated the Vermont False Claims Act

361. **32 V.S.A. § 631 *et seq.***

362. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

363. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Vermont, in violation of Vt. Code. § 631 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Vermont State-funded programs to officers or employees of the State within the meaning of Vt. Code. § 631 *et seq.*. Defendants also

caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Vt. Code. § 631 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

364. The Vermont State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

365. As a result of the Defendants' actions as set forth above in this Complaint, the State of Vermont has been, and continues to be, severely damaged.

366. Additionally, the State of Vermont is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXXIII:

### Defendants Violated the Virginia Fraud Against Taxpayers Act

368. ### Va. Code Ann. § 8.01-216.1 *et seq.*

369. Relators reincorporate herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

370. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Virginia, in violation of Va. Code Ann. § 8.01-216.1 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Virginia State-funded programs to officers or employees of the State within the meaning of Va. Code Ann. § 8.01-216.1 *et seq.*.

77

Defendants also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of Va. Code Ann. § 8.01-216.1 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

371. The Virginia State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

372. As a result of the Defendants' actions as set forth above in this Complaint, the State of Virginia has been, and continues to be, severely damaged.

Additionally, the State of Virginia is entitled to the maximum penalty of $11,000 374. for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXXIV:

### Defendants Violated the Washington State Medicaid Fraud False Claims Act

375. **RCW § 74.66.005 *et seq.***

Relators reincorporate herein by reference each and every allegation of the 376. preceding paragraphs of this Complaint as though fully set forth herein.

377. As a result of the foregoing conduct, the Defendants knowingly and improperly submitted false claims to the State of Washington, in violation of RCW § 74.66.005 *et seq.*.

By virtue of the acts described above, Defendants have knowingly presented false claims for payment or approval under Medicaid and other Washington State-funded programs to officers or employees of the State within the meaning of RCW § 74.66.005 *et seq.*. Defendants

also caused to be made or used false records or statements material to the false or fraudulent claims within the meaning of RCW § 74.66.005 *et seq.*.

The claims relevant to this Count include all claims for payment for services by Defendants that were obtained through their fraudulent conduct.

378. The Washington State Government approved, paid, and continues to approve and pay claims under Medicaid that it otherwise would not approve or pay, if not for Defendants' fraudulent conduct.

379.

As a result of the Defendants' actions as set forth above in this Complaint, the State of Washington has been, and continues to be, severely damaged.

Additionally, the State of Washington is entitled to the maximum penalty of $11,000 for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

381.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Relators pray for judgment against Defendants as follows:

a. That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq;*

b. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $11,181 and not more than $22,927 for each violation of 31 U.S.C. § 3729 proven at trial, plus attorney fees.

c. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the States have sustained because of Defendants' actions, plus the maximum civil penalty for each violation of 31 U.S.C. § 3729 proven at trial, plus attorney fees.

## TRIAL BY JURY

Relators-Plaintiffs demand trial by jury on all issues so triable.

Dated: July 24, 2019

Respectfully submitted:

Attorneys for Relators
**SANFORD HEISLER SHARP, LLP**

BY:

Kevin Sharp
Herbert Vincent McKnight, Jr.
John McKnight
700 Pennsylvania Avenue, SE
Suite 300
Washington, D.C. 20003
(202) 499-5200
Dated: July 24, 2019
ksharp@sanfordheisler.com
vmcknight@sanfordheisler.com
jmcknight@sanfordheisler.com

*Attorneys for the Plaintiffs-Relators*